Our next case is 4-12-0820, People v. Cartmill. For the appellant is Mr. McNeil. For the appellee is Darren Kimmel. Mr. McNeil, you may proceed, sir. Counsel. The issue in this case is whether the trial court erred in granting defendants motion to suppress because the officer had reasonable suspicion and the authority to stop the defendant based on a traffic violation. The defendant parked on a road that was on private property in an apartment complex but open to the public. He parked over a section of the side of the street that was marked with yellow stripes in front of an apartment building entrance. He then left his vehicle with his vehicle running and walked towards the apartment building entrance. Is the record clear as to how far he went? Apparently the trial court made a finding that he got about 20 feet away from his car. Because if I understood correctly, they thought the defendant's brief suggested it could be as close as 3 feet. What's that all about? I kind of questioned that as well. I know that the trial court, I don't know what the trial court based the 20 feet on. Well, but the court said 20 feet. Yes. The only testimony about feet was from the officer, which he said 20 to 30. And who was the officer that only wanted to testify? Officer Banger of the Quincy Police Department. Was he the only witness? No, there were other witnesses, but the only witness, yes, to the traffic violations. Okay, and when, how did the officer describe the stop of the defendant? He observed the defendant stopping his car, leaving it running, getting out, and walking towards an apartment building entrance. He then approached the defendant, asked for his identification, asked for his parent's license. Was it, is the record more clear when you say he approached the defendant as he was walking up behind him, I guess? The defendant was walking in one direction away from the officer, and the officer was walking up behind him and said, Hey, wait a minute, or stop, or worse than ever. I think it would be maybe he pulled behind the car, which was in front of an apartment building. He gets out of his car, the policeman gets out of his car, and then approaches him, addresses him like that. Counsel, let me stop you there. Is it correct that the officer pulled in behind the defendant? The defendant was basically sitting in his running car at the time the officer pulled in. Is that correct? I don't know if it made it clear that he was sitting in his car or if he observed him pull up in his car. Isn't the record clear that the defendant was sitting in his car? Because doesn't it go on, didn't the officer testify that just as he was about to get out of his car, the defendant got out of his car and started approaching the apartment building? Yes, as far as that was clear, I didn't know that. I couldn't recall if the officer stated that the car pulled up or if he pulled up while the car was sitting there. Well, we know the officer didn't observe any driving on the part of the defendant, isn't that true? I won't concede that because I don't recall on the record whether he saw him pull up to the apartment complex or not. Okay, and then with respect to the distance, how far the defendant had gone away from the car, wasn't there testimony that he took a few steps, the officer said stop, he took a few more steps, the officer said stop? Apparently he initially addressed the defendant, the defendant kept walking towards the apartment building entrance. That much is definitely true on the record. Officer Banger admitted that or at least testified to that. Again, trial court found the defendant was approximately 20 feet away, although the only testimony was that he was 20 or 30 feet away. Officer Banger also acknowledged that this apartment complex was on private property but testified that the Quincy Police Department had a policy to enforce traffic laws on these roads where they are situated on private property but open to the public, that they regularly enforce traffic laws in this area and that he was trained to enforce traffic laws. It's interesting that the city has this policy, but the better question is, isn't it, whether either the Quincy Ordinance or the Illinois VILCA Code permits enforcement on private property? That is one question, but also I think that the more overarching question would be whether he reasonably believed that this, reasonably suspected that the defendant was violating this ordinance when stopping, when approaching the defendant. Well, but that would depend on the ordinance, not whether the city has a policy, whether the police have a policy. They could have a policy of enforcing various laws in your living room, but I think that wouldn't make any difference, would it? That would be true. I would say that this policy would be more well-founded because it prevents traffic accidents or promotes safety in the public because, again, they are for the laws or for the protection of the public. The public safety concerns are the same on these private roads because they're open to the public just as much as they would be on any public road. Again, I suppose... What was the argument by the state at the trial level regarding the reason the search was appropriate? The reason? They argued that the statute applied, the Quincy Municipal Ordinance applied in this private apartment complex. To authorize their stop? Correct. Was there any reference to the vehicle code? There was not. You mean the state statute? Yes. There was not, although the language of the two are practically identical. Well, forfeiture doctrine applies to the prosecution as well, and my concern is if you're here asking us to reverse the trial judge's determination, I just want to make clear, are you arguing to us... Two questions. One, are you arguing to us that the officer's actions were appropriate under the Illinois Vehicle Code under the prohibition against leaving a car with the engine going and walking away from it? And if you are, was that argument raised to the trial judge on behalf of the state in opposition at the trial level to the defendant's motion to suppress? The only reason I brought up the state code in my brief is to make the correlation of certain other traffic violations that are applied throughout the state on private property. Counsel, you didn't answer my question. I didn't ask, why did you raise the issue of the vehicle code in your brief? My question was, what was raised by the state at the trial level? That the Quincy Ordinance was violated. So there was no reference to the Illinois Vehicle Code at the trial level? No, as far as I know. Does the Quincy Ordinance require some agreement regarding the enforcement of that ordinance on private property? It does not mention it. Again, the only testimony or evidence presented was Officer Banger's testimony, but he was trained to enforce traffic laws in these situations. Counsel, didn't we have testimony, I can't hear the name now, from someone associated with the city? Quincy, what was that testimony? A city engineer testified that there are certain written agreements, express agreements, certain public or private properties, like the mall I think was the only example, that the police are authorized to enforce traffic laws on their private property, on the public roadways. He didn't definitively say that there wasn't an agreement with this apartment complex, but he did say he was not aware of it. And then we had testimony from a woman who previously worked for the apartment building? Yeah, regarding the loading zone. And was she asked about any agreements? I don't think so. I know she testified that that was just like a loading zone, that it was not a parking zone. Right. Again, along with the city engineer, I think you have to take Officer Banger's testimony about the way he was trained, the Quincy Police Department's policy and their regular procedures when looking at the enforcement of the traffic law. What if they trained him badly? If they trained him badly, yeah, that's bad. If they trained him to do something that he didn't have authority to do, you can't justify what he did by the basis of the bad training, can you? No. Again, I would submit that this isn't a bad policy because all it does is enforce traffic laws on roadways that are open to the public but are on private property. I don't think that anyone would argue with this policy being bad. I don't think anyone in that apartment complex would be angry with a Quincy Police Department officer riding a speeding ticket to someone speeding 30 miles an hour above the speed limit. Well, how about if a young mother with three little children, including a couple of babies that couldn't walk, pulled into the loading zone, the same loading zone, and got her kids into the apartment together with her groceries before she moved her car? Do you think that Quincy Police would have ticketed her for that? Well, you mean assuming that she left her car unlocked? Yeah. And running? Yeah. I would assume so. That presents the same public danger as any other car left unattended. What public danger is that? Any public danger associated with an unattended vehicle, like accidentally going into gear, someone getting inside in that hypothetical, a child taking control of the vehicle. Well, what's the difference between her unloading in the loading area as opposed to her unloading in a designated parking spot? Well, I think these are two separate, the unattended vehicle and the no parking violations were two separate violations in the officer's eyes. I don't think he was saying, I don't think it was a double unattended vehicle because he thought he was parked in a no parking zone. I just think that along with the defendant leaving his vehicle unattended, Officer Bangert also thought, or reasonably believed, I'd submit that he was parked in a no parking zone. That's based on the fact that there was the former property manager who testified this yellow striped zone was a loading zone instead of a no parking zone. There was no signage either way. I think the defendant even conceded that usually this would indicate no parking. But the ordinance requires signs if it's a no parking place, right? True. I guess, I don't know what the ordinance requires about loading zones either, but there was no signage for a loading zone. No, I'm talking about for no parking zones. Right, right. There was no signage either way. And the ordinance requires signage to alert a person that you can't park here. Is that correct? Yes. The Quincy Ordinance does, yes. Again, I don't think that Officer Bangert's belief was unreasonable that he was parked in a no parking zone. I think anybody's common sense judgment would mean a huge block of yellow stripes and a yellow curve would mean no parking. Again, there was no signage saying it was a loading zone or indicating otherwise. And in his experience as a police officer, yellow stripes usually meant no parking. Again, there were no signs. You're correct about that. But I don't think it was unreasonable for him to believe that he was parked in a no parking zone. But the true standard here is, again, whether Officer Bangert reasonably believed that the defendant was committing these ordinance violations. Now, what if he's making a mistake of law? How does that impact that analysis? I think this Court's opinion in Cole makes it pretty clear that mistakes of law or mistakes of fact... I'd submit that this is a mistake of fact, but this Court in Cole stated, certainly the trial court's determination should not focus on whether an offense was actually committed, but whether an arresting officer reasonably suspected at the time of the stop that criminal activity was taking place or about to take place. It shows that this Court takes into account the reasonableness of an officer's mistake, whether it be law or fact. Here I would submit that it was a mistake of fact. A mistake of law would be him misapplying a no parking statute. That means he wasn't wrong in saying that it was wrong. You can't park in a no parking zone. He knew that. This was a mistake of fact, that this particular yellow stripe zone was not what it commonly would be, a no parking zone. It was a landing zone, apparently, based on... Which case are you just... Cole. Cole. People v. Cole. It's a 4th District case. I'm looking at your brief. I have a reply brief. Where is it mentioned in your brief? The reply brief. The reply brief. 8 through 10. Go ahead. Okay. Again, this guideline in Cole can be applied to both of the traffic violations here. Again, it was reasonable that the police officer would think that it was a more common no parking zone than a loading zone. And it was reasonable for him to assume even if this Quincy ordinance didn't apply to this specific private property, based on the department's policy, based on his training, based on their regular procedures, that it was reasonable to believe that the defendant was violating this ordinance. Well, these aren't all that complicated as concepts. Why would a normal routine cop think that parking matters on private property would be subject to municipal enforcement by you? Again, I think the parking one was an additional one. I think that the big one was the unattended vehicle. Again, it's a public, I mean, it's not a public roadway, I should say, but it's a private roadway open to the public, just as any public street is. The same dangers present themselves on this public or private roadway as it would on a... Why didn't, if you're saying the ordinance is similar to the state statute, it doesn't require any sort of approval, why didn't the state argue the state statute at the trial level? Well, why didn't it? Yes. Because I'm guessing he was charged with the Quincy Municipal Ordinance and... So that would limit the state's argument on what would be a justification for a stat? I couldn't tell you why they didn't charge him with the state version rather than the municipal ordinance version. Again, I would also point out that the defendant bears the burden of proof on this hearing on a motion to suppress, and the Supreme Court in Gibson found that inventory searches can be upheld solely on an officer's unrebutted testimony that he was following standard procedures without evidence of written policy. Here, that's exactly what Banger testified, testified extensively that he was trained this way, that the procedure of the Quincy Police Department was to enforce traffic laws in these situations, and that that indeed was their policy. I don't think that the city manager's testimony that he merely was not aware of a specific agreement between the two overcomes the defendant's burden of proof, especially when Officer Banger testified unrebutted that the policy of the police department and the procedures of the police department were considered to stop. Did the state argue at the trial level that the actions constituted a violation of the city ordinance? Yes. Did the state argue at the trial level that even if it didn't, that the officer's mistaken but good faith belief that it did would suffice? I'm not, I don't know if that was brought up because I think as their consistent position was that the municipal ordinance, that the Quincy ordinance was violated. Well, but you're more, the emphasis that you've placed in this argument seems to be on the latter, doesn't it? You seem to be arguing that, well, you know, even if it doesn't, he reasonably believed it did and that was legitimate. Is that your argument? Was that an argument presented to the trial judge? Indirectly, I suppose. Well, I'm not interested indirectly, counsel. Was that an argument that was presented to the trial judge as justification for the police officer's action in response to the defendant's motion to suppress? I don't recall whether it was or wasn't. If it was, it wasn't the primary argument. I can't speak for my colleagues, counsel, but this is real important to me because the forfeiture doctrine applies to the state as well when you are the appellant. And what that means is this. I am seriously disinclined to reverse a trial judge based on an argument the trial judge never heard. So my question is, did the judge hear this argument? I would submit that the state presented at least some semblance of this argument. Say that you would submit that what? The state presented this argument, some semblance of this argument at the trial level. Some semblance of this argument? Yes. Okay. Thank you, counsel. Mr. Kimmel? Do you have any better grasp of the proceedings at the trial level than Mr. McNeil did with regards to the last question I raised? I hope so, Your Honor. And did the state present this argument at the trial level? No, Your Honor. Both the arguments you've referred to were waived below. No, forfeited below, not waived. Intentional relinquishment of a known right. Both the arguments we've discussed today were waived below. So the state simply said, hey, this Quincy Ordinance, we could enforce it, and that was the justification? No, that was the end of it. The two ordinances. And just to start out properly, may it please the Court. Counsel. Counsel. My name is Darren Kimmel, and on behalf of the Office of the State Appellate Defender, I represent the FLE Terrell and Cartmill. The police officer in this case made an unlawful seizure of Mr. Cartmill, and the trial court correctly suppressed the resulting evidence of that seizure.  which were not against the manifest weight of the evidence, and affirm its order branching the motion to suppress for three reasons. First, the officer had no authority to enforce either of the claimed violations, in this case, on this particular piece of private property. Second, the trial court rightly found that Mr. Cartmill's vehicle was unattended, and it is undisputed that he was not parked in a parking zone. And third, Terry principles, seizure principles, do not apply to parking violations. Of course, in addition to that, as Your Honor just noted, two of the State's key arguments were, in fact, forfeit below. The Terry good faith argument, that even if violations had not occurred, that the officer reasonably believed they had occurred, and that that itself was sufficient as a Terry basis, even if no violations had occurred. That argument was not made below, and is properly considered forfeited by the State. Didn't the Supreme Court of Illinois, a few months ago, hold that police are allowed to conduct a custodial search incident to arrest for a traffic violation or a petty offense? They did, Your Honor. Why doesn't that then answer the question of your claim that the Terry stop wouldn't be appropriate if the police had reasonable suspicion under the circumstances of this case? Your Honor, that case involved probable cause. It does not follow. That's a Heider standard. Yes, it is. So if they had probable cause to conduct a search based upon a petty offense or traffic violation, how could it be argued that they wouldn't have a basis to conduct a Terry stop? Your Honor, you're referring to my third point. I'm only discussing parking violations, and that's a somewhat narrower argument than the argument made in the brief, which is a bit broader, which is what Professor Wayne Lefebvre argues, which is that, quote, the Terry rule should be expressly limited to the investigation of serious offenses. That's a somewhat broader argument. An interesting academic point rendered moot two months ago by the Supreme Court of Illinois in People v. Fitzgerald. Your Honor, I don't believe it was. That did involve probable cause, and I think even though that is a somewhat landmark decision, it doesn't necessarily trickle down to the Terry situation, where the U.S. Supreme Court has consistently stated that there needs to be a balance between privacy interests in the person who's being seized and the law enforcement interests at issue. No court has ever held that a parking violation, which does not need to involve the person at all. It only involves ticketing the car. As Officer Banger testified, he likes to leave tickets on cars that are idling in driveways. He doesn't go and knock on the doorway. He does that. He just tickets the car. There's no law enforcement interest in a parking violation in the actual driver. That's distinguished from a general moving violation where the officer needs to ticket the person, say, for speeding. What is the nature of the violation for leaving a car unattended with the motor running? It's to leave a ticket on the car, as Officer Banger testified. That's it? Yes. So that wouldn't be a petty offense under the traffic law for which someone could be stopped and arrested? They wouldn't be driving, Your Honor, so they wouldn't need to be stopped. I found one case in research where a parking offense occurred and then the person drove away, so then the officer needed to stop the person. If they find a stopped car, as Your Honor noted here, the officer drove up behind and parked behind a stopped car and then watched Mr. Cartmill exit the vehicle. There was no driving here. If there's a need to stop the car— So the driving is the requirement? If there's a need to follow the car and stop it in order to serve the parking citation, that would be a different scenario. Here— Let's assume that the officer here saw the guy get out of the car and walk. He's 30 feet away, walking in the other direction. The officer sees the car is running and stops his car. Is he unauthorized, in your theory, to order the defendant to stop and have him return to the car for this traffic violation and to frisk him or have the car turned off or whatever? No, Your Honor. That's the distinction I'm making. This is a parking violation, not a traffic violation. Well, I'm asking about the unattended vehicle aspect of the case, which seems to me to be far more serious. Right. I would make a few distinctions. In that scenario, we're assuming that the officer has authority in the first place to be issuing tickets at all, which is not the case here. We're also assuming that he makes it at least 30 feet. That's not the testimony here. The testimony here says he made it a few steps, was told to stop, made it a few more steps, was told to stop, and then he did. The testimony says that the apartment building is 30 feet away, and he never made it that far. So, again, if he made it 30 feet, that would be farther than here. The factual finding… Is Mr. Viglio correct that the only one who gave an estimate of distance was the officer who said 20 feet? It was actually one of the attorneys, Your Honor. It was a question by the defense counsel. So he didn't make it even 20 or 30 feet, and the officer said, yes, he did not make it even 20 or 30 feet. The trial court order contains the factual finding on page 37 that he made it between 3 and 20 feet, which may seem an odd factual finding, but that's what we have to work with, and this court owes the lower court a great deal of deference on that point. It's not 20 feet, as the state has repeatedly tried to assert. It's between 3 and 20 feet. Well, the point is, under the record as before, is he left an unintended car and was walking away. Isn't that clear? No, it's not. In fact, the trial court found the opposite of that. Based on the 3 to 20 feet, the trial court found that it was not unattended. Well, not using as a term of art for the moment, he left the car unattended with the motor running and was walking away when he was stopped by the police. He left the car behind. Okay, left the car behind, was walking away when he was stopped by the police. Yes. Is there any suggestion in this record that had the police not stopped him, he wouldn't have continued into the building? There's not, Your Honor, but the Supreme Court has repeatedly held that a stop has to be supported at its inception. Okay, so let me ask you this before you concede that there's not. Didn't the defendant testify that the reason he was there was to get his sister? He did, yes. And that he did not intend to go into the apartment. He was going to ring the bell and then go back to his vehicle, that he did not intend to enter the apartment. That's true, Your Honor. I would, again, assert, however, that Officer Banger had no way of knowing that when he yelled stop. And so that is absolutely true, though, Your Honor. All the testimony said was that he was intending to ring the bell. The apartment building was about 20 or 30 feet away. It's a bit unclear. But he never made it there. That is clear. And he only intended to ring the bell. The officer had no way of knowing any of this. So assuming it would have been a violation of this vehicle statute if he walked up to the building and entered it, but he walked up to the building and just rang the doorbell, it's your position that it would not be a violation then? That's correct, Your Honor. He never made it that far. But even in that situation, if he had gone a bit further. How far do you think the law requires he go before a police officer has reason to believe that the statute has been violated? It's a bit unclear, Your Honor. There are literally no Illinois courts that have really defined the term unattended. The state cites to be seen versus check or cap for any case. Well, you know, we spoke with Mr. McNeil about this question being forfeited. But if it were not, and that's a question for us to address anyway, the Supreme Court of Illinois in the Nye case in 1954 said, we cannot but conclude that this entire section, the unattended vehicle section, is a public safety measure. This being so, what harm did the legislature foresee and attempt to prevent by prohibiting the leaving of an unattended motor vehicle with the key in the ignition? And they said it's here, it's used clear and express terms, making it the duty of persons in charge of motor vehicles to do certain acts upon leaving their vehicles unattended. The motivation is not the state's desire to punish, rather it's interest in public welfare for the protection of persons. They don't want people walking away from cars that are going to be running. And I think the danger is pretty obvious, even if he just walks as far as the building. But your point earlier is a good one. As he's walking away from this car that's unattended with the engine running, the officer can't know how far he's going, can he? No, no, Your Honor. But he is walking away, and he's walking away in that direction, and unless the officer stops him, he has reason to believe that this statute is being violated and will continue to be violated in the question of what's unattended, does he not? No, Your Honor, because I would turn back to my original point, which is that he had no authority to enforce any safety violation. Well, let's look to the unattended motor vehicle statute itself. The Illinois Vehicle Code says, no person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, removing the key from the ignition, effectively setting the brake thereon, and when standing upon any perceptible grade, turning the front wheels to the curb at the side of the highway. Is it your position that doesn't apply if we're dealing with a private parking lot? It is, Your Honor. I think the word highway, first of all, is a clue to that. But this Court in Rubio v. Reynolds made that explicit finding in stating that not only did the state vehicle code not apply on private property and that that's the established holding of all the districts of the Illinois Appellate Court, but now for decades it found that the city of Springfield, in that case, had to have a contract with the grocery store parking lot that was at issue there to extend its municipal ordinance to cover that private property. It then went on to analyze the city municipal ordinance of Springfield that was at issue there, and it included extra language. It included language saying no one can leave a vehicle unattended in any public place. That language is not present in the Quincy City Code, which mirrors exactly the language Your Honor just read. And this Court in that case found that that additional language did assert authority over private property. Nothing in this case does. That was in the context of the question of the scope for purposes of negligence action, wasn't that? Yes, Your Honor. Although essentially all of the cases that have been cited by either side are negligence cases, this question never comes up in a criminal context. And this Court was, for purposes of this case, it's still very useful. The Rural Court was directly analyzing whether the statute applies or not. But why should it? Given what the Supreme Court said about the danger of unattended vehicles, why is it less of a danger for an unattended vehicle to be sitting in a parking lot of this Quincy housing complex than the parking lot of the strip mall a block away? I'm not qualified to answer that question. Your Honor, what I would answer is... As a matter of policy, as we seek to interpret what the legislature intended, can you give me any explanation as to why the one is more dangerous than the other? I can give the answer that the state legislature did not see fit to include extra language, as they did in the DUI statute. And I think this is important, Your Honor. This Court is interpreting legislative intent. In the DUI cases, the stateside suit, Erickson and the City of Highland Park v. Block, the reason the Court extended the DUI statute in those cases to private property is because it found additional language not present in the unattended vehicle statute. And it found from that language, elsewhere throughout the state, in addition to the public highways. Elsewhere throughout the state, it found that... That's dealing with the operation and movement of vehicles, isn't it? Yes, Your Honor. Here's what 11-201 says about the provisions of the Act referring to vehicles on the highway as an exception. Provisions of this chapter relating to the operation of vehicles refer exclusively to the operation of vehicles on highways, except when a different place is located. But the whole idea behind the unattended vehicle statute has nothing to do with the vehicle's operation, does it? I'm not sure I would go with you that far, Your Honor. Well, it's sitting there. It's not being operated. I apologize. The additional language I was referring to, Your Honor, is in the specific DUI statute. It's not the broader umbrella clause you were just referring to. And I would distinguish it on that point. The unattended vehicle statute includes the word highway as well, as I noted previously. No, it does not. It only includes that. I just read it to you. The last word in the sentence, Your Honor.  No person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, removing the key from the ignition, effectively setting the brake thereon, and when standing upon perceptible grade, turning the front wheels to the curb or side of the highway. I would argue just the basic grammar of that sentence. Even though it is in a separate clause, highway is still a clue. Well, it's also preceded by when standing on any perceptible grade. So there's no perceptible grade. That's not a requirement, is it? Fair enough, Your Honor. I would turn back to Your Honor's point that this argument was forfeited below, that the state vehicle code was, in fact, never brought up below, and that without any evidence of a contract. I want to make this clear, however. The court below actually made a factual finding, an affirmative factual finding, that no contract between the city and this apartment complex existed. It's not, as the state argued, that it was an open question. The court said, I am going to find now that no contract exists. That's the factual finding we're working with. That's not against the manifest way of the evidence. The city, private entities have the right to contract with the city to extend municipal ordinances onto their property. This apartment complex didn't do that. That generally is sufficient to take care of Your Honor's concerns with the danger of unintended vehicles. Most stores with parking lots are going to contract with the city, and that has been sufficient in Illinois until now. But, you know, we're talking about municipalities. I mean, this might apply for places that aren't municipal. The question is, if the vehicle code applies, we don't need any, I think the phrase is, we don't need no stinking agreements, do we? Wouldn't that be applicable? Only if it was not forfeited, and if it, in fact, does apply. I would argue both. Of course. Does not forfeit. If the state chose to raise this argument in the first place. And that in addition to it actually applying, which I still believe it does not. I want to turn back to Justice Appleton's comment from a moment ago about a mother unloading her groceries and her children, however. In our brief, we talked at length about the type of absurd results that would come if we did apply the statute or the local city ordinance to all private property. It's clear the legislature did not intend to extend this to all private property, and we should follow that clear legislative result to avoid those absurd outcomes. Why would it be absurd to say don't leave unintended vehicles in private parking lots? Your Honor. Given what the Supreme Court of Illinois says is the purpose of the statute. If we're going to define unintended vehicle the way the state would argue it to mean unoccupied, you would be ticketed and apparently seized under Terry for getting out of your car to de-ice it on a cold winter day or to warm up your car. No, I think unintended means you've walked away. Let's assume you've entered the apartment building. Okay. Why would that be unreasonable to say or an absurd result to say that the legislature didn't want you to do that? Your Honor, people cannot warm up their cars outside. Well, no, warming up your car, that's not my hypothetical, and that's not what I think it would cover. I don't think, you know, unintended means you have to be sitting in it. You could be scraping ice away. That would be absurd. I meant going out and turning it on, coming back inside, finishing up, getting ready, and then going back and getting in your car, leaving it outside running to warm up. Well. In your driveway. In your driveway. In your own driveway at home. Say you're blessed enough to live in a house and not an apartment complex. But I guess this goes back to the earlier question, why would it be more dangerous or more of a concern to the legislature and the Supreme Court in my case to leave an unattended car operating at the parking lot of a strip mall than in the parking lot of the Quincy housing complex? Your Honor, in my case, I do not believe it involved a strip mall. I believe it was city property. Well, I'm just asking you, given the Supreme Court's expression of concern, what the statute's about, why is it more dangerous to leave a car in a strip mall parking lot than in an apartment building parking lot? I don't think there is a distinction on danger. I think the legislature made a distinction on authorization and whether it applies. I don't think the circumstances change. It's just whether the law applies or not. And Illinois courts are clear, the law does not apply on private property unless there is some extra authority. Well, I'm not asking for a legal interpretation. I'm just asking for, is it policy matter? If it were Senator Kimmel sitting there in the August body of the state Senate and this proposal came up, and someone said, well, Senator, is there some reason why we shouldn't have a broader application of the unattended motor vehicle policy, such as why is it more dangerous in a strip mall parking lot than an apartment building parking lot, what would be your response? Your Honor, I'd say there are more likely to be other people present in public places that are not private residences. There are more dangers. There are more things that cars that start rolling away could harm in a public setting than in a private setting. But I see my time has expired. Okay. Thank you, counsel. Thank you. Mr. McNeil? I'd submit the difference between these hypotheticals is that this was not a driveway. This was not private. This was open to the public. People's driveways aren't open to the public. This was presumably a road that, I don't know, there's a turn signal or a light or a stop sign that you enter this road just like you would any other public road. What if it was a private driveway? I'd say go visit my friend. Drive, put my car in park, leave the motor running, get out of my car, go up and ring the doorbell saying I'm here. In a private driveway? Yeah. What's the difference? The difference is that the threat to public safety is not the same as it would be on a public roadway. Now, counsel, we don't really have, at least I don't have, a good picture of the layout. But I guess when I think about a driveway, many times they back right up to a road, a public road, where if it rolled down the driveway, you're into traffic. Whereas with an apartment building, many times you pull into an area and it's more secluded where the parking is to approach the apartments. Again, I guess there will be, there's a ton of hypotheticals that we could throw out. I would submit that a lot of the dangers associated with an unattended vehicle are alleviated in a private driveway. Again, I would submit it's more secluded than any private roadway that's open to the public. A roadway or a parking lot? A roadway. This was on Diana Drive in Quincy. I've never been there. That's what I'm saying. But I'm presuming it's a roadway, like with lanes and, I mean, it was on private property. This was in a parking lot. I think it was on Diana Drive, correct, as far as the record stated. How many public streets have a yellow striped area? And whether we call it a loading zone or whether we call it a no parking area, I don't, whatever. How is that compatible with a public street? I envision it like a frontage road, a Walmart or a mall or something like that. That's how I envision this roadway being. Again, open to the public, more of a roadway than would be, a driveway would be. And as far as Your Honor was stating, the officer can know how far the defendant was going or can reasonably infer because he got out and walked towards an apartment building. If that was 30 feet away, then I think it's pretty reasonable to infer that the defendant was going to at least ring the doorbell, if not go inside and knock on the door and get at least 30 feet away. I would also argue that this was an investigatory stop pursuant to Terry. He asked for the defendant's identification. I therefore think that the state argued Terry principles at the trial level and that this argument was not forfeited. This argument wasn't forfeited. Again, this was completely consistent with any Terry stop where an officer sees a violation and then asks the offender for identification. So I don't think that the Terry principles were forfeited. That being the reasonable, articulable suspicion argument was forfeited at the trial level here. If there are no more questions. Thank you, counsel. We'll take some other advice from the recess for a few moments.